| | | |
|---|---|---|
| BART S. HERSKO, | : | Case No. 3:15-cv-215 |
| | : | |
| Plaintiff, | : | Judge Thomas M. Rose |
| | : | |
| v. | : | |
| | : | |
| HEATHER WILSON, SECRETARY OF | : | |
| THE UNITED STATES AIR FORCE, et al., | : | |
| | : | |
| Defendants. | : | |

---

### ENTRY AND ORDER GRANTING THE SECRETARY OF THE UNITED STATES AIR FORCE'S MOTION FOR SUMMARY JUDGMENT (DOC. 59) AND TERMINATING CASE

---

This employment discrimination case is before the Court on the Motion for Summary Judgment (Doc. 59) filed by Defendant Heather Wilson, Secretary of the United States Air Force ("Air Force"). Plaintiff Bart S. Hersko ("Hersko") was employed as a patent attorney with the Air Force from September 2004 through April 2013. He claims that the Air Force terminated his employment after failing to make reasonable accommodations for his obsessive-compulsive disorder ("OCD") and other disabilities in violation of the Rehabilitation Act, 29 USC § 791 *et seq.* Hersko further alleges that he was terminated in retaliation for requesting such reasonable accommodations and subjected to a hostile work environment due to his disabilities. The Air Force denies these allegations and asserts that Hersko was terminated for troubling performance issues after he failed to successfully complete a Performance Improvement Plan.

The Air Force's Motion for Summary Judgment is fully briefed and ripe for review. (Docs. 59, 77, 79.) For the reasons below, the Court **GRANTS** the Motion for Summary Judgment and dismisses this case in its entirety.

## I. FACTUAL BACKGROUND

### A. The Air Force Hires Hersko as Patent Attorney

The Air Force hired Hersko as a civilian chemical patent attorney in 2004. Hersko was assigned to the Air Force Materiel Command Law Office, Intellectual Property-JAZ Division, located at Wright Patterson Air Force Base in Dayton, Ohio. Hersko's duties included managing the chemical invention docket, reviewing invention disclosures for technical sufficiency and patentability, and preparing and prosecuting patent applications. All patent attorneys in the JAZ Division must work forty hours per week and submit leave slips in advance for any scheduled time off and bi-weekly time sheets that accurately reflect all time off.

In his first three years with the Air Force, Hersko performed his duties satisfactorily and earned performance awards in 2005 and 2006. In 2008, however, Hersko's supervisors began to suspect that he was abusing his teleworking privilege and working less than 40 hours per week. On March 3, 2008, for example, Hersko was teleworking when a supervisor attempted to contact him by telephone. Hersko never responded to the supervisor. Instead, Hersko sent another supervisor an email at 8:00 pm that night claiming he was at a doctor's appointment and would submit a leave slip the next day for the previous afternoon.

Due to concerns that Hersko was not working 40 hours per week, Richard Lambert, the JAZ Division Chief and Hersko's second-level supervisor, conditioned Hersko's teleworking privilege on Hersko maintaining connectivity to the Air Force base email system. On September 19, 2008, just ten days after the Air Force renewed Hersko's teleworking privilege, Stephen Sayeedi, the Technology Transfer Branch Chief, and another employee discovered Hersko asleep in his office with a pillow, blanket, and exercise pad. To conceal his actions, Hersko had locked

and placed a post-it note on his door stating that he was in a meeting. Because Hersko's feet were visible from an adjacent office, however, Sayeedi was prompted to unlock and enter Hersko's office. When confronted, Hersko first claimed he was exercising, not sleeping, and asked Sayeedi not to report him. Three days later, Hersko admitted to his direct supervisor at the time, Chris Menke, that he had been napping, apologized, and vowed not to nap in his office again. Hersko also told Mr. Menke that he was stressed, depressed, and on various prescription medicines that might have contributed to his actions. Menke terminated Hersko's teleworking privileges pending an investigation into the incident.

After an investigation and consulting with Civilian Personnel Employee Relations ("Civilian Personnel"), Menke recommended suspending Hersko for three days without pay. In response, Hersko admitted taking a nap on the floor of his office, stated that he was "wrong" and felt "terrible," and suggested that a reprimand would be a more appropriate sanction. On December 5, 2008, Hersko was given a three-day suspension without pay. Hersko was notified of his right to file a formal grievance to contest the decision but did not do so.

Issues concerning Hersko's work practices continued to arise in 2009. On April 20 and 21, 2009, Menke had difficulty finding Hersko in the office even though he had not submitted a leave slip. The next month, Hersko left work before his duty shift concluded without notifying any supervisor or submitting a leave request. In response, Hersko wrote that he did not recall what time he left the office, but may have left early if he had arrived early. Menke reported that, when questioned about the incident in person, Hersko appeared "uneasy and worried" and offered to submit a leave form "if that would keep upper management and [Civilian Personnel] from finding out about this." Hersko was formally reprimanded on September 2, 2009.

Menke also placed Hersko on a reporting requirement pursuant to which Hersko was required to email Menke from his government computer when he arrived each day no later than 9:05 am and prior to departing each day, no earlier than 5:25 pm. After sixty days, Mr. Menke lifted the reporting requirement because Hersko demonstrated that, when tracked, he could arrive on time and not leave early.

On May 22, 2009, Menke provided Hersko interim performance assessments of 3 on each of his performance objectives, representing satisfactory performance. Menke told Hersko, however, that his "quantity of work was low." Hersko responded that his low productivity was caused by the negative attention created by his suspension and formal reprimand. Menke noted he was concerned that Hersko was "trying to use his misbehavior as justification for reduced quantity of work product." He also stated that he was "very concerned that [Hersko] is not learning from his mistakes. Rather, he attempts to cover up his misbehavior or dilute his misbehavior with various excuses, reasons, and unrelated side comments."

Less than a month after his reporting requirements were lifted, on August 12, 2009, Menke was unable to locate Hersko for a fifty-minute period in the morning when the rest of the JAZ staff convened for a webcast from the Judge Advocate General. Hersko arrived late to the webcast and later told Menke that he had went to get coffee and to the bathroom, spoke with inventors, and went to the bank. Menke was not convinced that Hersko's explanation for his absence was truthful. Menke also documented that Hersko was not in his office from 12:30 pm to 1:40 pm the same day. Menke thought that Hersko might have been eating lunch, but he was carrying a boxed lunch when Menke found him at 1:40 pm.

In February 2010, Menke noticed that Hersko would disappear for hours each day without

explanation. Menke logged Hersko's time away from the office for a full two-week time period. After consulting with Civilian Personnel, Menke enlisted Lambert's assistance to track Hersko's whereabouts for a second two-week period. Together, Lambert and Menke observed Hersko take a total of 25.5 hours of unauthorized leave over a twenty-eight-day period. At the conclusion of each time period, Hersko submitted clean time sheets that indicated no leave taken (except for a single day he was sick) and confirmed to his supervisors that the time sheets were correct and accurate.

Menke discussed the unauthorized leave with Hersko, annotated the false timesheets to accurately reflect the absences without leave, consulted Civilian Personnel regarding appropriate discipline, terminated Hersko's fitness privileges, and issued a Notice of Proposed Suspension. Paul Dankovich, Plaintiff's third-level supervisor, ruled on the merits and issued a decision to suspend Hersko for fourteen days without pay. Hersko did not appeal the decision and served his suspension in July 2010.

### B. Hersko Notifies Air Force of Disability and Requests Accommodation

A week after being confronted for taking unauthorized leave, on March 8, 2010, Hersko provided Menke a letter stating that he suffered from OCD and believed that this disorder caused the behavior that Mr. Menke observed. Hersko acknowledged that he needed to change his behavior to comply with the "standards of conduct and Air Force core values." He stated that his OCD did not adversely affect his ability to perform the essential functions of his job, but also claimed "it may prove necessary for me to request an accommodation for my obsessive-compulsive disorder." At deposition, Hersko clarified that he suffered from OCD and associated anxiety and depression, but they did not prevent him from following supervisory directions,

complying with USAF rules and policies, or adequately performing the functions of his job.

Hersko's letter began an interactive process between Hersko, his supervisors, Civilian Personnel, and the Occupational Medicine Department, that culminated in the Air Force granting certain accommodations on September 1, 2010. Upon receiving Hersko's letter, Menke consulted with Gary Martinelli in Civilian Personnel. He then emailed Hersko the following day both to clarify whether he was in fact requesting an accommodation and to outline the medical documentation required for such a request. Because Hersko had not been receiving treatment for his OCD for the previous ten years, he requested time to locate a new psychiatrist to provide the necessary documentation. Three weeks later, Hersko provided Menke a medical note from his new psychiatrist, Dr. Amarjeet Birdi, confirming a diagnosis of OCD and depression.

Hersko asked Menke to take Dr. Birdi's diagnosis into consideration in the pending disciplinary proceeding. Menke again requested guidance from Civilian Personnel. Martinelli responded that, under EEOC regulations, an employee's disability does not excuse misconduct, but can be taken into consideration in determining a punishment.

Menke contacted Hersko, who indicated that he wanted to request an accommodation, but was concerned that requesting an accommodation would reflect unfavorably on him or be 'used against' him in the pending disciplinary process. Menke assured Plaintiff that this would not happen and asked Civilian Personnel to confirm that Plaintiff would not be retaliated against for requesting an accommodation. Menke forwarded Civilian Personnel's guidance directly to the Hersko and explained that the accommodation would not cast him in an unfavorable light to management. Rather, the Air Force would consider Hersko's medical condition and accommodation request to determine if the Air Force could accommodate him so that he could be

"as productive as possible given his medical needs."

Menke then consulted with Hersko on the nature of his disability, the effect of the disability on his work, and potential accommodations for the disability. Hersko ultimately suggested three accommodations: (1) praise and positive feedback; (2) a flexible work schedule; and (3) teleworking. Next, Menke contacted the Occupational Medicine Department to review Hersko's request and drafted a supervisory letter to assist its evaluation. That letter set forth the relevant factual background, outlined Hersko's position and job duties, listed medical-related questions on which he was seeking guidance, and commented on Hersko's proposed accommodations. Specifically, Menke noted (1) that giving "false praise and fake positive reinforcement for the sake of accommodation would be detrimental;" (2) that Hersko already enjoyed a flexible work schedule and Menke had no objection to continuing that arrangement; and (3) that Menke was opposed to permitting telework as an accommodation given Hersko's history of abusing time.

Dr. Birdi submitted an additional short letter dated May 7 that stated that Hersko's OCD-related fatigue and anxiety made "it difficult for him to concentrate and focus on the job duties." The letter concluded: "I recommend and appreciate any accommodations at job such as teleworking and fitness privileges to help decrease anxiety."

Major Jon Jacobson, of Occupational Medicine, reviewed Menke's letter and supporting documentation and evaluated Hersko in-person, before issuing his formal assessment on June 4, 2010. He affirmed Hersko's diagnosis and opined that the accommodations could benefit Hersko, but it would be necessary for Hersko to re-build trust and operate within established rules.

## C. Air Force Formally Grants Accommodations

On September 1, 2010, the Air Force formally granted Hersko the accommodations

necessary for him to meet his job duties. Because Menke had left Air Force service, Hersko's new supervisor, Jeff Moore, issued the final approval. That approval largely mirrored Occupational Medicine's recommendations.

First, Moore agreed that regular feedback was useful and outlined several feedback pathways for Hersko, including newly implemented regular staff meetings and an open invitation for Hersko to discuss his work and role with Moore at any time. Second, Moore reinstated Hersko's fitness privileges within established rules as Occupational Medicine suggested. Specifically, because Hersko had recently abused this privilege, he was required to send emails when he left for and returned from his fitness time as well as follow the standard protocol for signing the log sheet. Moore explained that this requirement was in part for Hersko's benefit: "Misuse of your duty hours again would be taken very seriously and may result in your dismissal from Government service. Requiring these emails will hopefully keep you focused on the need for precise and credible accounting of your duty time." Third, Moore denied Hersko's request for teleworking, but indicated that he would reconsider the request after a trust-building period. Moore explained that teleworking would make it impossible for him to monitor Hersko's duty hours, which was a serious concern given Hersko's history of intentional deception. Moore also noted that telework would interfere with his ability to provide feedback to Hersko. Finally, although not explicitly mentioned in the letter, the Air Force permitted Hersko to work a flexible workday. Under the flexible workday program, Hersko's self-established duty day began at 9:00 am and ended at 5:30 pm, with a half hour break for lunch.

Moore's accommodation letter informed Hersko that he could challenge the decision by filing either a grievance through the Civilian Personnel Administrative Grievance System or a

complaint through the Equal Employment Office. Hersko neither appealed the decision nor sought any advice.

Moore served as Hersko's first-level supervisor from August 2010 until June 2011. Moore encountered many of the same difficulties with Hersko that prior supervisors documented. He attempted to track Hersko's unexplained absences, recording several times where Hersko was absent from his office for an extended period without submitting a leave slip or adjusting his timesheet. Moore concluded that disciplinary action was warranted, but fell ill and was hospitalized before initiating such action.

Moore was also concerned about Hersko's declining performance during this time. In April 2011, Moore issued Hersko an unsatisfactory review that rated him deficient in two of six critical elements—namely, preparing and prosecuting patent applications and reviewing invention disclosures. The review stated that less than 60% of Hersko's patent drafting work and 70% of his patent prosecution work was on time, which was significantly less than the 90% target. The review further noted that Hersko did not generate any new licenses or identify any new inventions by teaming with labs, but instead waited for work to come to him. Moore met with Hersko to discuss the unsatisfactory review. In that meeting, Hersko conceded that his performance would not be acceptable at a law firm, but that at a law firm, he "would be making $200,000." Hersko attempted to deflect blame for his late work product by claiming that two of his patent drafts were late because the inventor did not want to work on two more applications at the time. Moore admonished Hersko that it is not proper practice to rely on inventors to draft patents. The Air Force requires its attorneys to collect relevant information from inventors and then draft the patents themselves because they are complex legal documents.

Hersko's supervisors investigated further and discovered that Hersko had long relied on inventors to submit initial drafts of patents to him, often by way of a template that he would circulate to the inventor ahead of time.

At various times, Hersko denied to his supervisors that he ever sent inventors templates to fill out. Those denials were contradicted by the emails discussed above. Moreover, in August 2012, a group of inventors complained to Hersko's supervisors that he asked them to draft a patent application for him. When deposed, Hersko initially testified that he had never asked inventors to prepare draft patent applications for him. Then, when presented with the above-referenced communications, Hersko's position shifted, asserting that the inventors did not "look like [they] were upset about it" and that inventors "like to be helpful."

### D. **Hersko Files First Grievances**

After his negative performance review, Hersko filed two formal grievances in short succession. The first grievance, filed May 4, 2011, challenged his unacceptable rating as unjustified and requested that the rating be changed to acceptable. A month and a half later, while the first grievance was pending, Hersko filed a second grievance claiming that Moore and Lambert retaliated against him for filing the first grievance. Dankovich served as the decision-maker for both grievances. He investigated both sets of claims and appointed an independent factfinder in each case to interview witnesses and collect relevant documents. Dankovich upheld the first grievance on procedural grounds and changed Herkso's rating to satisfactory, but denied the second grievance because Hersko's supervisors were justified in their actions. The first decision concluded that Hersko was "not given adequate warning that [his] performance was below standards and provided with a fair opportunity to improve that performance." Dankovich did not,

however, find "any evidence that there was any arbitrary and/or subjective application of the performance appraisal criteria." Dankovich did not endorse Hersko's performance, however, stating "this action does not imply that I find your performance to be acceptable."

Dankovich denied the second grievance, finding that each of the actions about which Hersko complained were supported and well-founded. Relying on the factfinder's report, Dankovich concluded that Hersko was not subject to any reprisal or retaliation. First, the record indicated that Plaintiff had previously been counseled about improper attire; that his dress on the day in question had been not only casual, but also slovenly and unprofessional; and that this was not an isolated instance. Second, Mr. Dankovich found that the decision to charge Plaintiff .75 hours AWOL was justified based on documentation showing unexcused absences on June 6 and 8. Third, he concluded that any surveillance of Hersko proper given his past misconduct, stating that "[g]iven your past history of attendance issues, increased monitoring of your whereabouts would not only be appropriate, but expected."

In June 2011, Moore suffered a life-threatening medical emergency. Consequently, Lambert, Hersko's second-level supervisor, assumed temporary supervision of the Patent Law Branch from June 2011 to October 2011, and became Hersko's first-level supervisor. Beginning in October 2011, Sayeedi, already the Technology Transfer Branch Chief, assumed supervision of both branches and served as Plaintiff's first-level supervisor until Moore returned from medical leave in July 2012. During this period, Hersko continued to have difficulties meeting expectations.

When Sayeedi became Hersko's supervisor, the two already had a history of personal animosity originating well before Sayeedi or the Air Force was aware of Hersko's disability. For example, Sayeedi previously discovered Plaintiff sleeping in his office and had called Hersko a

sociopath based on Sayeedi's belief that Hersko lied with ease. As Hersko's supervisor, Sayeedi became increasingly frustrated with Hersko's work practices. Weekly staff meetings during this period included Sayeedi confronting Hersko about his work product or conduct, and Hersko attempting to deflect Sayeedi's criticism. Hersko asserts that Sayeedi berated him during their conversations, while Sayeedi maintains that he was merely frustrated with Hersko's work product.

A review of Hersko's work in late 2011 uncovered that he had abandoned a potential Air Force Patent because he had missed a statutory deadline when he did not file the provisional patent within one year of public disclosure of the invention in an online article. To Lambert, Hersko had compounded his original error by submitting a response to the patent examiner that Lambert considered to be misleading. Because the subsequent submission raised the specter of fraud on the United States Patent and Trademark Office ("USPTO"), he reported the incident to the Judge Advocate General's Corps for investigation. While the subsequent investigation cleared Hersko of fraud charges, his mistake cost the Air Force the opportunity to patent the invention.

On March 1, 2012, Sayeedi, in consultation with Civilian Personnel, instituted supervisory controls to address Plaintiff's unsatisfactory work performance and inability to manage his workload. Hersko was subject to five supervisory controls: (1) he was required to seek written approval from a supervisor before filing anything with the USPTO; (2) he was required to seek advance approval for any communication with inventors or other clients; (3) he was required to submit a draft of all work product one week before he submitted the final product; (4) he was required to do his own work, not rely on drafts from clients or solicit work product from other attorneys; and (5) he was required to submit a daily work report indicating the issues or activities he worked on that day and the amount of time spent on each item. The controls did not bar him

from communicating with the USPTO or inventors. Sayeedi required that he secure advance permission so that he could review any filings for deficiencies and safeguard against Hersko enlisting inventors to draft his patent applications.

On May 30, 2012, Sayeedi issued Plaintiff an unsatisfactory review that rated him deficient in three of six elements (preparing and prosecuting patent applications; reviewing invention disclosures; and fulfilling the professional responsibilities of an attorney). The review identified many of the same issues that Sayeedi had previously documented: Hersko had filed a substantial number of documents that did not comply with the Manual of Patent Examination Procedure ("MPEP"); he had failed to keep his docket current and complete his work on time; and he had repeatedly misrepresented his efforts and blamed others for his own poor work product.

The following week, Sayeedi temporarily relieved Hersko of his patent drafting duties and reassigned him to review and catalogue Cooperative Research and Development ("CRADA") Agreements. Hersko was originally assigned to complete the work in the basement where the files were stored. He returned to his office after four days, however, when he encountered Dankovich in the basement and complained about the poor ventilation. Dankovich immediately contacted Lambert and directed Hersko to return to his office. It took Hersko approximately seven weeks to complete the project. During that time, he maintained his same salary and position, but did not work on any patent applications.

### E. Hersko Files Third Grievance

Hersko filed a third formal grievance in response to his unsatisfactory review and the decision to temporarily relieve him of his patent drafting duties. In that grievance he claimed: (1) that his work met all objective criteria; (2) that Sayeedi's deadlines were arbitrary and subjective;

and (3) that Sayeedi had a "personal vendetta" against him and was "doing everything in his power to try to discredit [his] performance with the ultimate goal of trying to fire" him.   The grievance requested that his rating be changed to acceptable and that Sayeedi be replaced as supervisor.

Dankovich again served as the decision-maker.   He did not appoint a separate factfinder for this grievance, but conducted the investigation, including nine interviews, himself.   After the exhaustive investigation, which included looking into Hersko's claim that Sayeedi had called him "too crazy to think straight," Dankovich upheld the rating and concluded that Hersko's allegations were unfounded.   He determined that Hersko's work product fell grossly short of the standards set forth in the MPEP; that Hersko's substandard case management and lack of attention to detail had needlessly compromised critical Air Force intellectual property rights on more than one occasion; and that Hersko had duped USAF inventors into "producing substantial portions of work," which Hersko then misrepresented as his own.   Dankovich confirmed that Sayeedi raised his voice to Plaintiff at various times, but witnesses testified that Hersko gave Sayeedi good cause to be frustrated.

### F.   Hersko Placed on Performance Improvement Plan

Moore returned to Air Force service in the summer of 2012 and resumed supervision of Hersko.   After consultation with Civilian Personnel, Moore placed Hersko on a Performance Improvement Plan ("PIP"), which is required once an employee receives an unsatisfactory rating. Moore's decision to place Hersko on a PIP was based on Sayeedi's review and his earlier supervision of Hersko.   The PIP provided for a 90-day evaluation period (later extended) in which Hersko could show improvement, but placed Hersko on notice that if he failed to demonstrate improvement, he could be subject to demotion or removal.   The PIP contained a review of

Hersko's work and examples where Hersko's work was deficient. Moore extended the supervisory controls in the PIP because he deemed them necessary for Hersko to improve. He further required Hersko email when he arrived in the morning, when he left in the evening, and every time he left his office, except for when he went to the printer. Hersko did not have to seek permission to leave his office, only send a notification. The PIP noted that the purpose of this was to help Hersko track his time, noting that time management was one of his weakest areas.

Hersko's notification requirement remained in place for only three weeks. After Hersko complained to Civilian Personnel, the requirement was discontinued, except that Hersko still had to send an email when he arrived in the morning and left for the day. Hersko was permitted to continue to use the physical fitness privilege throughout the PIP period, though Moore suggested that he refrain from using it when he had overdue work.

The PIP set forth specific benchmarks for achieving success on a weekly basis. To pass each week, Hersko had to have fewer than three failures. To pass the PIP, Hersko had to pass 80% of the weeks. The PIP outlined what actions would constitute failures including, for instance, any late or overdue deliverable. Lying or misrepresenting facts would automatically fail Hersko for the week, and three total lies during the PIP would automatically fail Hersko for the entire PIP.

Under the PIP, Moore and Hersko met on a weekly basis. At each meeting, Moore prepared a summary of Hersko's work that week. Hersko could respond to Moore's summaries in writing, and Moore would include his response on the same master document. These weekly summaries document Moore's ongoing concerns with Hersko's work product and Hersko's unwillingness to modify his approach to his work in response. Moore issued Hersko a progress

review on September 17, 2012 that put Hersko on notice that his performance continued to fall below expectations. That review noted that Hersko's production was minimal, and that Hersko had slept through an in-house training.

Hersko's conduct during the PIP also led Moore to issue him a Notice of Consideration of Proposed Disciplinary Action on October 22, 2012. That incident involved duplicate oaths and declarations filed with the USPTO without Moore's prior review. Not only was it a violation of the PIP for Hersko to file documents with the PTO without first securing supervisory approval, Hersko's filings were substantively improper. Moore uncovered the issue in the course of his weekly review of Hersko's work and confronted Hersko about the improper filings. Hersko responded that the office's paralegal was to blame.

Upon further investigation, Moore determined that Hersko's version of events was not credible as the paralegal only would have filed the items at Hersko's direction; that even if the paralegal filed the documents Hersko bore ultimate responsibility for ensuring the accuracy of those filings; and further that in the course of preparing the patent applications Hersko had communicated with inventors without first seeking Moore's permission as required under the PIP. Moore also concluded that Hersko had deliberately misrepresented his involvement and possibly destroyed relevant documents in an attempt to conceal his defective work product. Moore ultimately decided against initiating a separate disciplinary action, but incorporated his findings into his evaluation of Hersko's performance under the PIP.

The PIP period concluded on November 30, 2012. Moore did not evaluate Hersko's performance in the first, partial week of the PIP. Hersko failed each of the remaining 14 weeks of the PIP under the evaluation standards set out in the PIP. Because he did not pass 80% of the

individual weeks as required under the PIP, he failed the PIP as a whole. Moore further determined that Hersko failed to demonstrate an adequate level of performance for the standards of critical elements 1, 2, and 3 of his Civilian Performance Plan.

### G. Hersko's Supervisor Issues Notice of Proposed Removal

After consultation with Civilian Personnel, Moore issued a Notice of Proposed Removal to Hersko on February 25, 2013. The document contains a detailed critique of Hersko's performance during the PIP. Moore noted that Hersko's productivity fell well below acceptable levels; that his work product was substandard and did not conform to USPTO requirements; and that he abandoned two patents during the PIP and inadvertently caused a patent examiner to withdraw his allowance on another patent application. The Notice also addressed concerns that Moore had with Hersko's truthfulness during the PIP period, including his failure to disclose that he had asked inventors to draft patents despite his claims at the start of the PIP that he never asked inventors to do his work. Finally, the Notice indicated that Hersko frequently failed to follow repeated instructions during the PIP. This included directions to make specific correction in the work product, to maintain complete patent files, and save his work to the shared network drive.

Hersko submitted a reply to the Notice of Proposed Removal to Dankovich, the neutral decision-maker for the action. The reply dismissed Moore's concerns as "banal minutiae" and claimed that all the work he submitted during the PIP was of acceptable quality and that any missed deadlines or decreased productivity resulted either from Mr. Moore's insistence that he revise his work, Moore's delay in returning his work, or restrictions associated with the supervisory controls. Hersko asserted throughout his response that his work during the PIP period must have been acceptable (1) because his work prior to the PIP had resulted in the issuance of 215 patents over

27 years; and (2) because it is unreasonable to believe "that all of Mr. Moore's arguments are considered persuasive while at the very same time every one of my arguments and/or rebuttals to his arguments are considered non-persuasive."

In addition to his written response, Hersko met with Dankovich for approximately one hour on March 25, 2013 to present an oral response. That presentation recirculated many of the arguments that he set forth in his written response, including that Mr. Moore was personally biased against him and that he was unfairly subjected to a higher standard than his colleagues.

Dankovich issued his termination decision on April 18, 2013 and set forth his reasoning in a separate memorandum that discussed each of the Douglas factors he was required to consider in reaching his decision. Dankovich found that the evidence presented overwhelmingly established that Hersko had failed to perform at an acceptable level and that removal was justified. Dankovich concluded that Hersko's "misconduct was intentional, repeated, and counterproductive of the opportunity period he was afforded to perform at an acceptable level." Hersko was removed from service on April 19, 2013.

### H. Hersko Appeals Removal Decision

Hersko appealed the removal decision in a mixed-case appeal to the Merit Systems Protection Board ("MSPB"). He asserted: (1) that the PIP was not administered properly; (2) that he did not fail to satisfactorily perform his duties or improve as instructed; and (3) that he was discriminated against based upon his disability because the USAF failed to grant any requested accommodation. Hersko presented his case to Administrative Judge Julie Packard on August 7 and 8, 2013.

Judge Packard issued an Initial Decision upholding the removal on April 2, 2014. She

found first that the PIP provided Hersko a reasonable opportunity to improve his performance and rejected his claim that harassment by Sayeedi or Moore had rendered it impossible for him to improve his performance during the PIP. With respect to Hersko's second claim, she found that Hersko's work did not meet the performance standards of the first critical element. Judge Packard noted that the Air Force had provided Hersko many of the accommodations he requested, including a flexible work schedule and physical fitness time. Because Hersko failed to establish that the remaining, non-granted accommodations were reasonable, he had not met his prima facie case, and the defense failed.

Hersko petitioned Judge Packard's decision for review before the full MSPB Board. On November 24, 2014, the MSPB denied Hersko's petition for review and affirmed the initial decision because it found no error in any of Judge Packard's findings, nor any reason to revisit her credibility determinations. The Board's final order informed Hersko of his right to seek administrative review of his discrimination claim before the Equal Employment Opportunity Commission ("EEOC"). Hersko petitioned the EEOC Office of Federal Operations for review of the MSPB's Final Decision. Hersko presented two arguments to the EEOC: (1) that "the agency discriminated against [Hersko] by its failure to accommodate his disability;" and (2) that the EEO was not required to give deference to Judge Packard's credibility determinations. As part of his failure to accommodate argument, Hersko alleged that Sayeedi and Moore had harassed him in retaliation for his accommodation request instead of providing him the positive feedback he sought.

The EEOC issued its decision on May 19, 2015 concurring in the MSPB's finding of no disability discrimination based on failure to accommodate. The decision endorsed the MSPB's

legal conclusion that Hersko was not qualified for his position because he had not identified any reasonable accommodations that were denied to him that would have permitted him to perform the essential functions of his job.   It informed Hersko of his right to file suit in federal district court, which he did on June 18, 2015.

## II.      LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."   *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."   *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.   It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co., Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A *Wright & Miller, Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.* However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091 (1990). Thus, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

## III.  <u>ANALYSIS</u>

Hersko alleges that the Air Force violated the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*,

and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. Under the Rehabilitation Act, Hersko specifically claims that the Air Force discriminated against him by failing to provide reasonable accommodations to his disability, discriminating against him solely on the basis of his disability, subjecting him to a hostile work environment due to his disability, and terminating his employment in retaliation for his request for reasonable accommodation. Hersko had also asserted claims for retaliation relating to his use of medical leave under the FMLA. He withdrew those claims, however, in his response to the Air Force's Motion for Summary Judgment. (Doc. 77 at PAGEID # 2996.) Accordingly, Hersko's claims under the FMLA are **DISMISSED.** The Court considers Hersko's claims under the Rehabilitation Act below.

### A. <u>Whether Hersko Has Exhausted His Administrative Remedies</u>

The Air Force first argues that Hersko failed to exhaust his administrative remedies as to all of his claims under the Rehabilitation Act, with the lone exception of his claim for failure to accommodate. An employee alleging discrimination against a federal agency under the Rehabilitation Act must exhaust his administrative remedies before proceeding to federal court. *Smith v. USPS*, 742 F.2d 257, 262 (6th Cir. 1984). The purpose of the exhaustion requirement "is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) (citation omitted). The requirement, however, "is not meant to be overly rigid, nor should it 'result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading.'" *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006) (quoting *EEOC v. McCall Printing Co.*, 633 F.2d 1232, 1235 (6th Cir. 1980)).

The Sixth Circuit therefore directs that "the EEOC complaint should be liberally construed to encompass all claims 'reasonably expected to grow out of the charge of discrimination.'" *Id.* (quoting *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir.1992)).

The Air Force argues that Hersko raised only one employment discrimination theory in the administrative proceedings—that it failed to provide reasonable accommodation for his disability. On his MSPB complaint, Hersko checked the box indicating that he was appealing his "Removal (Termination after probationary or initial service period)". (Doc. 75-1 at PAGEID# 2801.) The form asked him to explain briefly "why you think the agency was wrong in taking this action," in response to which Hersko wrote: "I deny that I failed to satisfactorily perform my duties or improve as instructed. The PIP was not administered properly. I was discriminated against because of my disability." (*Id.*) He also checked a box indicating that he alleged a claim for disability discrimination and, in explanation, wrote: "Appellant suffers from obsessive-compulsive disorder (OCD) which is an anxiety disorder. Appellant has been treated for this disorder and depression by a psychiatric [sic] and the employer knew about the disability and failed to grant any accommodation." (*Id.* at PAGEID# 2803.)

After an initial pre-hearing conference, the MSPB entered an order setting forth the issues to be adjudicated. (Doc. 75-3.) They included Hersko's allegations that the Air Force (1) discriminated against him on the basis of his disability, (2) discriminated against him by failing to reasonably accommodate his disability, and (3) subjected him to disparate treatment. (*Id.*) In addition, the Administrative Judge noted that Hersko "claims he was subjected to hostile treatment by his supervisors that effectively defeated the purpose of the PIP and made it impossible for him to improve his performance." (Doc. 75-3 at PAGEID# 2819.) The MSPB's Initial Decision

specifically addressed Hersko's harassment allegations, although it found that the alleged harassment had not impeded his ability to successfully complete his PIP. (Doc. 75-4 at PAGEID# 2833.)

In his Petition for Review of the Initial Decision, Hersko raised the same allegations against the Air Force. (Doc. 75-5.) The Air Force responded to each those allegations, including the harassment allegation, in its formal Response. (Doc. 75-6.) The MSPB denied the Petition for Review and affirmed its Initial Decision, which therefore became its final decision. (Doc. 75-8.) Hersko then appealed the MSPB's final decision to the EEOC. (Doc. 75-9.)

In his EEOC complaint, Hersko alleged that the Air Force discriminated against him on the basis of his disability, failed to provide reasonable accommodations to his disability, failed to administer his performance improvement plan in good faith, and retaliated against him for requesting reasonable accommodation. He specifically alleged that he was "subject to relentless harassment by his two supervisors in retaliation for his request for reasonable accommodations for his disability." (Doc. 75-9 at PAGEID# 2927.) The only explicit claim raised by Hersko, however, was that the Air Force discriminated against him by failing to accommodate his disability.

In light of the liberal standard that applies to the exhaustion requirement, Hersko preserved his claims in this lawsuit. Even if each individual claim was not presented as such, the allegations underlying his claims were. In other words, the claims in this lawsuit can be reasonably expected to grow out of the charge of discrimination before the EEOC. *Randolph*, 453 F.3d at 732.

### B. Hersko's Discrimination Claims under the Rehabilitation Act

The Rehabilitation Act "constitutes the exclusive remedy for a federal employee alleging

disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (citing 42 U.S.C. § 12111(5)(B)(i) (defining employers covered by the ADA, but excluding the United States or a corporation wholly owned by the U.S. government); *Peltier v. United States*, 388 F.3d 984, 989 (6th Cir.2004) ("[T]he Rehabilitation Act ... provides the remedy for federal employees alleging disability discrimination.")). Under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).

Each of Hersko's four claims under the Rehabilitation Act are discussed below.

### 1. <u>Reasonable Accommodation Claim</u>

The Air Force argues that Hersko has failed to identify any reasonable accommodation denied to him that would have enabled him to perform the essential duties of his job. As a result, Hersko cannot establish a *prima facie* case and the Air Force is entitled to summary judgment on this claim. The Court agrees.

The Rehabilitation Act and its implementing regulations require agencies, including the USAF, to "make reasonable accommodation to the known physical or mental limitations" of otherwise qualified disabled employees, "unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program." *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997). The regulations further require that both the employer and employee engage in a good faith, informal interactive process to identify the employee's limitations and potential reasonable accommodations. *See* 29 C.F.R. § 1630.2(o)(3); *see also Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202–03 (6th Cir. 2010).

In order to prevail on a failure-to-accommodate claim, a plaintiff first must establish a

*prima facie* case by showing: (1) that he is disabled; (2) that he is otherwise qualified for the position; (3) that the agency was aware of his disability; (4) that an accommodation was needed, *i.e.*, a causal relationship existed between the disability and the request for accommodation; and (5) that the agency failed to provide the necessary accommodation. *Gaines v. Runyon*, 107 F.3d 1171, 1175–76 (6th Cir. 1997). A disabled employee who claims that he is "otherwise qualified with a reasonable accommodation bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004). An accommodation is *per se* unreasonable if it removes an essential function of a job. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (*en banc*). If the plaintiff establishes a *prima facie* case, "the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs." *Gaines*, 107 F.3d at 1175–76.

The Air Force does not dispute that Hersko is disabled or that it was aware of Hersko's disability. (Doc. 59 at PAGEID# 1935.) The Air Force argues that Hersko cannot meet his burden of showing that any of the denied accommodations was reasonable.

Plaintiff requested the following accommodations: (1) praise and positive feedback, (2) a flexible work schedule, (3) a resumption of fitness privileges, and (4) teleworking. (Doc. 39-2 at PageID# 333, 335-36.) The Air Force granted Hersko's request for the resumption of his fitness privileges, within certain parameters, and a flexible work schedule. (*Id.* at PageID# 337.) It also agreed to a process designed to provide regular feedback to Hersko, which included regular meetings and an open invitation for Hersko to discuss his performance with his supervisor. (*Id.*)

The Air Force denied Hersko's request for telework, however, until he could re-establish trust in his ability to meet performance expectations. (*Id.*)

Hersko argues, however, that the Air Force denied his request for positive feedback. He asserts that, instead of positive feedback, all that he received was negative feedback, such as yelling, derogatory name calling, isolation from co-workers, having his attorney duties taken away, and the imposition of additional rules on him. Hersko mischaracterizes the record. The Air Force provided Hersko both positive and negative feedback after his accommodation request. Hersko received positive feedback, for example, from two of his supervisors—Lambert (Doc. 39 at PageID# 198, 204) and Moore (Doc. 53-1 at PageID# 1684)—for work well done. In essence, Hersko argues that he was entitled to all positive feedback due to his disability, but that is not a reasonable accommodation request. In order for Hersko to successfully complete his essential duties as a patent attorney, the Air Force needed to provide him an honest critique of his performance, whether positive or negative. The failure to identify and correct errors in a patent application could result in the Air Force losing valuable intellectual property rights—which actually occurred in this case—and frustrating its ability to accomplish its mission. Given the significant responsibility of his position, Hersko cannot establish that it would have been reasonable for the Air Force to provide him only positive feedback.

Hersko also argues that the Air Force violated the Rehabilitation Act by placing conditions on the resumption of his fitness privileges. Specifically, Hersko argues that it was unlawful to require Hersko to send an email to his supervisor when he left to use his fitness privileges and another email to his supervisor upon his return. In light of Hersko's documented history of abusing these privileges, however, he cannot establish that it would have reasonable to require the

Air Force to permit him to use his fitness privileges without this particular condition.  Put another way, no reasonable juror could find that the reporting condition so burdened the use of his fitness privileges that he was effectively denied the requested accommodation.

Hersko's demand that the Air Force permit him teleworking privileges is also unreasonable.  As to this issue, the Court is guided by *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753 (6th Cir. 2015).  In *Ford*, the Sixth Circuit recognized that, under the ADA, the general rule is "that regularly attending work on-site is essential to most jobs, especially interactive ones." *Id.* at 761.  In most jobs, "especially those involving teamwork and a high level of interaction, the employer will require regular and predictable on-site attendance from all employees (as evidenced by its words, policies, and practices)." *Id.* at 762.  As a patent attorney, Hersko's regular and predictable on-site attendance was essential to his duties.  He was required to participate in regular on-site trainings and staff meetings, and his work required personal contacts with numerous individuals located at Wright-Patterson Air Force Base, including draftsmen, various inventors, supervisors responsible for monitoring his work, and staff paralegals who assisted in USPTO filings.  (Doc. 51 at PageID# 1528; Doc. 45 at PageID# 900.)  In addition, Hersko's request to telework must be placed in context of his history of absenteeism and abuse of this specific privilege.  A reasonable juror could not find that it was reasonable to request permission to telework under these circumstances, where the Air Force had to be able to monitor Hersko's attendance to ensure the completion of his duties.

For these reasons, Hersko cannot meet his burden to establish that he was denied a reasonable accommodation and the Air Force is entitled to summary judgment on this claim.  The Court therefore does not consider whether the Air Force engaged in a good-faith, interactive

process with Hersko.  *Ford*, 782 F.3d at 766.

## 2. <u>Disability Discrimination Claim</u>

To prevail on his discrimination claim under the Rehabilitation Act, Hersko must be able to prove that (1) he is an individual with a disability, (2) he is otherwise qualified to perform the job requirements, with or without reasonable accommodation, and (3) he suffered an adverse employment action ***solely*** by reason of his disability.  *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (emphasis added); *see also Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en banc) (holding only the Rehabilitation Act, not the Americans with Disabilities Act, requires that the disability be the sole motivating factor for the adverse employment action).  A plaintiff may present direct evidence of disability discrimination or rely on circumstantial evidence to establish a prima facie case.  *Potter*, 488 F.3d at 403.  Where the plaintiff relies on circumstantial evidence, the familiar *McDonnell-Douglas* three-step burden-shifting framework applies.  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Here, Hersko does not claim to have direct evidence of discrimination; therefore, the *McDonnell-Douglas* framework applies.  Under that framework, the plaintiff bears the initial burden to establish a *prima facie* case of discrimination.  If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision.  If the employer carries its burden, then the burden returns to the plaintiff to prove by a preponderance of the evidence that the employer's proffered reason was actually "a pretext designed to mask illegal discrimination."  *Potter*, 488 at 404.  Hersko can defeat summary judgment only if his evidence is sufficient to "create a genuine dispute at each stage of the *McDonnell-Douglas* inquiry."  *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d

357, 363 n. 2 (6th Cir. 2007).

The Air Force argues that Hersko cannot establish a *prima facie* case because he has not adduced any facts establishing that similarly situated, non-disabled employees were treated more favorably than him. The Air Force also argues that Hersko cannot carry his burden of showing that the Air Force's proffered reasons for terminating his employment were merely a pretext for unlawful discrimination. As Hersko has failed to come forward with sufficient evidence of pretext, the Court does not consider whether Hersko can establish a *prima facie* claim.

The Air Force's legitimate, non-discriminatory reasons for terminating Hersko's employment are well-documented in this case. The Air Force found that Hersko abused his telework privilege, slept on the job and lied about it; repeatedly disappeared during the day and left early; and submitted materially false timesheets that concealed his time abuse. The Air Force further found that Hersko submitted deficient work product, did not accept constructive criticism and did not take responsibility for his own mistakes—blaming paralegals for them instead—and relied on inventors to draft portions of patent applications that should have been completed by an attorney. (*See*, *e.g.*, Doc. 50-22.)

Hersko may establish pretext by showing that the Air Force's proffered reasons for his termination (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action. *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 915 (6th Cir. 2013). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (citation and internal quotation marks

omitted). "[A] reason cannot... be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (emphases and quotation marks omitted).

Hersko asserts that Sayeedi was the primary actor in a discriminatory scheme against him. He claims that, as part of this scheme, Sayeedi began conducting surveillance on Hersko even before becoming his manager. Then, as Hersko's manager, Sayeed allegedly imposed more harsh and inflexible rules on Hersko, which Sayeedi allegedly knew were in direct conflict with the accommodations Hersko required for his disability. Hersko alleges that his failure under such harsh rules was inevitable. He therefore received lower performance reviews, which led to his PIP and ultimately his termination. Hersko refers to Sayeedi's remarks about his mental health and the brief imposition of a requirement that he email his supervisor every time he left his office, even if only to use the restroom. Overall, Hersko argues that the restrictions placed on him were punitive and had "no relationship" to his actual job duties. (Doc. 77 at PageID# 2994.)

Hersko's allegations cannot overcome the voluminous record documenting his deficiencies as a patent attorney under Air Force standards. This record is even more insurmountable because the criticism of his performance comes from several sources and was reviewed at multiple levels within the Air Force's disciplinary system. Hersko cannot reasonably dispute that he struggled with absenteeism, punctuality and general accountability for his work product and whereabouts during business hours. The extensive documentation of Hersko's failure to meet his PIP objectives demonstrates that he did not overcome these deficiencies. (Doc. 53 at PageID# 1636–92.)

Nor are Hersko's conspiracy allegations supported by the record. The Court must accept

all reasonable inferences from the facts in Hersko's favor, but it is not obliged to accept speculative theories divorced from the evidence. All of the rules and restrictions placed on Hersko were reasonably related to his specific performance issues. The "surveillance" that Hersko references was a response to the undisputed fact that his supervisors had trouble finding him and had observed behavior intended to deceive them as to where he was and what he was doing. There might be other inferences that could be drawn, but one of them is not that his supervisors were treating him differently solely because of his disability. When considering pretext at the summary judgment stage, "the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Here, a juror could not reasonably doubt that the Air Force placed restrictions on Hersko and ultimately fired him because of his work performance. Even if Hersko's supervisors were incorrect in their assessment of him, the record establishes that they acted on their honest belief that Hersko's conduct and work performance failed to abide by minimum Air Force standards. Summary judgment is appropriate where an employer relies on its honest, albeit mistaken, conviction that an individual is not a good employee. *Pesterfield v. Tenn. Valley Auth.*, 941 F.2d 437, 443 (6th Cir. 1991).

Since Hersko is unable to establish pretext, the Air Force is entitled to summary judgment on his disability discrimination claim.

### 3. <u>Hostile Work Environment Claim</u>

A plaintiff must establish five elements to prevail on a claim for hostile work environment: "(1) he was disabled; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment unreasonably interfered with his work performance; and (5)

defendant either knew or should have known about the harassment and failed to take corrective measures." *Plautz v. Potter*, 156 F. App'x 812, 818 (6th Cir. 2005). A hostile work environment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted). A court must consider all the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Plautz*, 156 F. App'x at 819 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). "Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006) (citing *Harris*, 510 U.S. at 21-22).

Hersko argues that the evidence demonstrates a hostile work environment arising from incidents of humiliation, bullying, shouting, name calling, spying, surveillance, requiring him to notify his supervisor of every time he left his office, and the placement of restrictions on his ability to complete his work duties.

Hersko's allegations of bullying, shouting and name calling are largely limited to Sayeedi. While Sayeedi made derogatory statements about Hersko, such as calling him crazy and a sociopath, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted);

*see also Coulson v. Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 858 (6th Cir. 2002) (affirming summary judgment because name-calling, alone, was not sufficient to create a hostile work environment*).*   In addition, Sayeedi first became aware of Hersko's disability after he became his supervisor in 2011.   (Doc. 78 at PageID# 3352.)[1]   Sayeedi's alleged harassment, however, began much earlier.   The causal link between Sayeedi's behavior and Hersko's disability is therefore lacking.   Rather, Sayeedi's frustration with and treatment of Hersko is linked to the same performance issues and covering up of those issues that led to his termination.

Many of the actions that Hersko cites as contributing to a hostile work environment are the restrictions placed on him to address his performance issues.   It is unreasonable to infer discriminatory animus from actions that are designed to permit Hersko to demonstrate his ability to meet Air Force expectations.   There were instances when Air Force personnel placed restrictions on Hersko that went beyond what might have been necessary to correct his behavior. In this regard, Hersko points to the requirement that he notify his supervisor every time he left his office, even if only to use the restroom.   He also refers to the time he was assigned to cataloguing files in a basement. In both instances, however, the Air Force promptly took action to terminate the excessive discipline.   Moore lifted the requirement that Hersko email when he left his office after three weeks.   (Doc. 53-5 at PageID# 1632.)   When Dankovich discovered Hersko working in the basement, he relieved him of his cataloguing duty after only four days.   (Doc. 41 at PageID#

---

[1]On October 14, 2011, Hersko sent Sayeedi an email requesting to take fitness leave.   (Doc. 78 at PageID# 3354.)   Sayeedi initially denied Hersko's request and told him to prepare a schedule for completion of his overdue assignments before taking fitness leave during duty hours.   (*Id*. at PageID# 3353.)   Less than two hours later, Sayeedi reversed himself, explaining that he had "received Plaintiff's personnel file for the first time" and "discovered an accommodation memo."   (*Id*. at PageID# 3352.)   Sayeedi immediately directed Hersko to "disregard my previous emails on this subject and continue to take fitness leave according to the terms outlined in that memo."   (*Id*.)

690.)  Dankovich also promptly investigated Hersko's claim in 2012 that Sayeedi called him crazy and counseled Sayeedi regarding his choice of language with regard to Hersko.  (Doc. 50-11 at PageID# 1117–1514.)  The Air Force's prompt action to improve Hersko's work environment is material because, to have an actionable claim, Hersko must demonstrate that the Air Force "knew or should have known about the harassment ***and failed to take corrective measures***."  *Plautz*, 156 F. App'x at 818 (emphasis added).  The record in this case is that the Air Force, as an institution, actively managed Hersko's situation, from his performance issues to his complaints about his treatment by supervisors.

Considering all the circumstances, the evidence cannot support a finding that Hersko was subjected to a hostile work environment.   The Air Force is therefore entitled to summary judgment on this claim.

### C. Hersko's Claim for Retaliation

A *prima facie* case of retaliation has four elements: (1) the plaintiff engaged in legally protected activity; (2) the defendant knew about the plaintiff's exercise of this right; (3) the defendant then took an employment action adverse to the plaintiff; and (4) the protected activity and the adverse employment action are causally connected.   *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).   If the plaintiff can establish a *prima facie* case, then the court applies the same three-step, burden-shifting analysis under *McDonnell-Douglas* applicable to discrimination claims under the Rehabilitation Act.   *Id.*

Even if Hersko were able to establish a *prima facie* case of retaliation, he is unable to establish that the Air Force's legitimate, non-discriminatory reasons for his termination were pretextual—as the Court discussed above.   The Air Force therefore is also entitled to summary

judgment on this claim.

**D. Hersko's Claims against Unnamed John Doe Defendants**

Hersko names several John Doe defendants in his Amended Complaint, but they have neither been identified nor served. The Air Force was advised by Hersko's counsel that he is not pursuing those claims and will terminate them. Hersko did not address those claims in his Memorandum in Opposition. The Court therefore deems those claims abandoned and they are hereby dismissed.

**IV.     CONCLUSION**

For the foregoing reasons, the Court **GRANTS** the Air Force's Motion for Summary Judgment (Doc. 59) in its entirety. The Clerk is directed to **TERMINATE** this action on the Court's docket.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, July 18, 2018.


s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE